UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                              )
PATRICIA A. FORBES,           )
       Plaintiff              )
                              )
   v.                         )        C.A. No. 14-249-M-PAS
                              )
CAROLYN W. COLVIN,            )
       Acting Commissioner of Social )
       Security,              )
       Defendant              )
_____)
```

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Judge.

This matter is before the Court on Ms. Forbes' Motion for Reversal (ECF No. 6) of the decision of an Administrative Law Judge (ALJ) affirming the denial of supplemental security income (SSI) benefits to her on her claim of total disability. The Commissioner has filed a Motion to Affirm. (ECF No. 8). For the reasons stated below, the Court remands the case for reconsideration by the ALJ.

## I.

### Procedural History

Patricia A. Forbes filed an application for supplemental security income (SSI) on November 30, 2010 (Tr. 14). She alleged a disability, due to a number of impairments, dating back to October 1, 2003. *Id.* Her claim was initially denied, denied on reconsideration, and denied after an evidentiary hearing held by ALJ Barry Best on September 20, 2012. *Id.* Ms. Forbes testified at that hearing, as did vocational expert Kenneth R. Smith. On September 28,

2012, the ALJ granted the Commissioner's Motion to Affirm and denied Ms. Forbes' Motion for Reversal, finding that she was not under a disability since November 30, 2010, because she had the residual functional capacity (RFC) to perform her former work as a security guard. (Tr. 25).

## II.

## Background

Ms. Forbes at the time of the hearing was a 52-year-old woman with a 10th grade education, no GED, and a sporadic work history at unskilled jobs. She lived at the relevant times with her daughter and her grandchildren. (Tr. 36-37).

Ms. Forbes' application for SSI benefits claimed that a disability that began with neck pain in 2002 had progressed to such an extent that it rendered her unable to perform any work in the employment marketplace. It was apparently while working at a donut shop in 2002 that she began to complain of substantial pain. She began to feel neck pain while mopping up and pain when lifting heavy trays, which she continued to do even after she began experiencing pain to relieve co-workers of the extra burden. (Tr. 350). She had some swelling on the left side of her cervical spine. In April of 2003, an X-ray revealed a cervical strain ("straightening of the cervical lordosis suggests spasm. ... Degenerative hypertrophic changes are noted at the endplates of the C6-C7 vertebra."). (Tr. 410). Physical therapy was prescribed. (Tr. 409). She had tried a series of measures in the spring of 2003, including physical therapy and cervical traction. She continued physical therapy into mid-July of 2003, when she terminated because she failed to progress and wanted to discontinue until receiving results of a pending MRI. (Tr. 373). By 2004, she was receiving Workers Compensation for C-5 disk disease. (Tr. 388).

Ms. Forbes' work history was episodic and, as detailed in her application back to 1995, was intermittent at best. She reported a series of jobs – counter person, hotel housekeeper,

grocery bagger, security guard, none of which lasted more than a year if even close to that. (Tr. 37, 167-74). Her primary employment seems to have been as a security guard for two different companies.[1] Each of those jobs involved significant walking. When she worked for a trucking company, she sat in a booth signing drivers in and out, and walked around making rounds every hour. (Tr. 37-38). At the Providence Gas Company, the hourly rounds had to be made every hour through the building – about a 15-minute tour in which she would have to demonstrate arriving at various checkpoints. After the inside inspection, she would have to walk the perimeter of the parking lot, again hitting various "stamps." She left the job when she moved to Newport. (Tr. 38). She testified that she had neither worked nor looked for work in the previous two years. (Tr. 39).

Her symptoms may have continued at this level for some time. In the spring of 2010, and continuing into the summer, Ms. Forbes complained to her primary care physician, Dr. Jorge Ruelos, M.D., that she was experiencing neck, hip, and knee pain as well as headaches, and was taking "a lot" of ibuprofen to deal with the pain. She was also experiencing significant fatigue. (Tr. 432).

At some point prior to November 2010, Ms. Forbes had stopped working altogether and, by that time, was not applying for any jobs. (Tr. 39). She had no income and received no public assistance other than food stamps; medical coverage was provided through her husband, but she lived with her daughter and granddaughter and not with her spouse. (Tr. 38).

Twelve days after filing her November 30, 2010, claim, Ms. Forbes was involved in a motor vehicle accident. (Tr. 64, 264). Her vehicle was struck from behind while stopped. (Tr. 264). She was treated at Roger Williams Medical Center Emergency Department on the day of

---

[1] Ms. Forbes' Work History indicates three different stints at security jobs for two different employers. (Tr. 167).

the accident, but within several days thereafter, she saw her primary care physician again and commenced a series of medical consultations and treatments that continued unabated until the time of the hearing on the instant claim for benefits.

Ms. Forbes testified she could not work because she was in "constant pain with [her] neck." She described her pain during the years preceding the hearing in the following terms:

> [If I] just, you know, tweak my neck a little bit then I'm in pain for days and days, and the pain is severe. And then I have severe back pain. The pain is down my legs when I stand up. If I walk it's constant pain.

(Tr. 39). Ms. Forbes described her daily life as dominated by pain. She took Percoset for the pain, but the medication made her very tired, and occasionally dizzy. (Tr. 42, 44). After taking a Percoset, she would sleep for 3 – 4 hours. If the pain persisted upon waking, she would take another pill and, presumably, go back to sleep. (Tr. 42). She averaged "maybe two [Percosets] a day" plus Ibuprofen. "On a good day I'll get up and eat." *Id.* She testified she was in pain every day, "but some days it's really severe." *Id.* On those days, particularly when the pain in her neck was very bad, she lost the ability to grip: dishes would "slip out of [her] hand" and her daughter would have to take over the task. *Id.*

She had headaches every day, but on the two days each week that were "good days," she would take Ibuprofen and sometimes babysit or watch TV. *Id.* Those were the days that she would try to do household tasks such as washing dishes. She no longer did laundry because she could not lift the baskets of clothing. (Tr. 42-43). She had retained her driver's license, she testified, but drove only on average once per month when her daughter could not drive her and she had no other way of going someplace important. (Tr. 43). She continued to go food shopping, but always accompanied by someone because of the feeling that the pain would make

4

her fall. *Id.* Generally, she said, after five or ten minutes on her feet, she would have to sit down. (Tr. 44).

## III.

### Medical Evidence

A cervical MRI performed two weeks after the accident in November 2010 showed "prominent left uncovertebral spurring at C6-C7 resulting in moderately severe narrowing of the left neural foramen" as well as "mild and diffuse disc osteophyte complex at C5-C6 effacing the ventral thecal sac but not impressing on the [spinal] cord." (Tr. 425). A lumbar MRI on the same date showed "an approximately 1.0 x 0.8 x 2.4 cm lipoma of the proximal aspect of the filum terminale at the conus without evidence for cord tethering or low lying cord" but also revealed a "mild disc bulge and facet arthropathy at L4-L5 without evidence of spinal stenosis or nerve root impingement." (Tr. 426).

Soon after the automobile accident, Ms. Forbes commenced chiropractic treatment. (Tr. 334). She experienced both neck and lower back pain, radiating down her arms and legs. The treating chiropractor, Amy Malek, D.C., noted an objective restriction of "[a]ctive cervical range of motion ... through all planes of movement." *Id.* Both a shoulder depression test and neutral cervical compression test were positive. "Active lumbar range of motion was restricted through all planes of movement, however pain was greatest with flexion and extension movements. Straight leg raise was positive for pain in the lower back, down into the right foot and on the left side down to the area just above the knee." Dr. Malek confirmed "[c]ervical sprain/strain with cervical radiculitis" as well as "[l]umbar sprain/strain with lumbar radiculitis."[2] *Id.* Dr. Malek

---

[2] "Radiculitis" is defined as "an inflammation involving a spinal nerve root, resulting in pain and hyperesthesia. http://medical-dictionary.thefreedictionary.com/radiculitis. (last visited April 7, 2015). "Cervical radiculopathy is the clinical description of pain and neurological symptoms

set a course of treatment at three times per week, for four weeks, considering Ms. Forbes "totally disabled" subject to a re-evaluation at the end of the four week period. (Tr. 334). In fact, regular treatments continued, with Ms. Forbes reporting the same consistent pain and daily headaches, until at least June 22, 2011, when a "final evaluation" from Dr. Malek assessed her at "maximum chiropractice improvement" and thus discharged her. (Tr. 310). Dr. Malek determined that Ms. Forbes had continued to be "totally disabled" throughout the 6 months of chiropractic treatment and offered a prognosis of "fair with residual symptoms." She recommended physical therapy. (Tr. 309).

During much of this time, Ms. Forbes was also treating with neurologist Richard Cervone, M.D. His first evaluation in the record was on February 1, 2011. (Tr. 288). He recounted in detail her complaints of pain, and summarized his diagnostic impression as "Traumatic left cervical radiculitis. Evaluate for frank cervical radiculopathy. Post-traumatic lumbosacral, thoracolumbar and cervical myofascitis with moderate/severe sprain/strain injuries. Post-traumatic headaches (cephalgia) resulting from cervicocranial myospasm. Post-traumatic sacroioliac injuries producing joint dysfunction and sacroilitis on the right side." (Tr. 290). He recommended further testing, but declared her totally disabled. *Id.* He concluded that her symptoms were related to the motor vehicle incident and related injuries. (Tr. 291). A few weeks later, a series of further diagnostic tests again related to arm pain produced "a normal study," but Dr. Cervone opined that her persistent symptoms "could be related to sclerotogenous referred pain patterns as what can be seen secondary to injuries to non-neurologic tissues (ligaments, capsules, joints, tendons, fascia) and/or inflammatory, non-compressive left cervical

---

resulting from any type of condition that irritates a nerve in the cervical spine (neck)." http://www.spine-health.com/conditions/neck-pain/what-cervical-radiculopathy. (date last visited April 7, 2015).

sensory radiculitis." (Tr. 295). He continued to treat her and, two months later, found compromised range of motion, "palpable myospasm and tenderness along the bilateral thoracolumbar soft tissue and spinal joint regions," and prominent pain on performing certain movements. He recounted a "preexisting lipoma as seen on MRI imaging performed on 12/10/10," which he termed "asymptomatic for years," and concluded that she had had "a traumatic symptomatic activation of this previously underlying quiescent condition." (Tr. 297). He continued to believe she was totally disabled. *Id.* He continued to see her, monitor her condition, and evaluate her for the next several months, noting on June 3, 2011, that she "could possibility have an early and mild motor neuropathy affecting her bilateral lower extremities," though he thought that "unlikely." (Tr. 303). He again repeated what he had noted back in February: that her pain could be secondary to "injuries to non-neurologic tissues." (Tr. 303-04). In addition, he concluded that her history, symptoms and clinical examination findings were consistent with "a right sacroiliitis"[3] and, while he thought it was remote, postulated again that the pain could stem from a previously asymptomatic pre-existing lipoma.[4] (Tr. 304).

By this time, Ms. Forbes was seeing her primary care physician regularly. During the course of the next two years, he examined her 11 times. She was reporting that her back pain was "getting worse," and he advised her to continue pain medication, even though it made her sleepy. His notes indicated he had prescribed Vicodin. (Tr. 423). He admonished that she

---

[3] "The term sacroiliitis is used to describe any inflammation in the sacroiliac joint, which is located on either side of the sacrum (lower spine) that connects to the iliac bone in the hip." http://www.spine-health.com/conditions/sacroiliac-joint-dysfunction/all-about-sacroiliitis. (last visited April 7, 2015).

[4] Lipoma is a "benign tumor of fatty tissue." http://www.oxforddictionaries.com/us/definition/american_english/lipoma. (last visited April 7, 2015).

should limit her walking and standing. *Id.* She was requesting referrals to a neurologist as well as to a physical therapist. *Id.*

At that point, Ms. Forbes saw neurologist Deus Cielo, M.D. He had referred her to physical therapy in June 2011 (Tr. 305) and three months later, on September 30, 2011, he wrote that she had improved some since undergoing cervical/lumber physical therapy, but still had "episodic low back pain radiating into both legs." She had normal muscle tone and strength, antalgic gait and positive straight leg raise testing at 30 degrees, but a spinal exam showed mild tenderness with decreased range of motion. His impression was of chronic cervical and lumbar radiculopathy. Significantly, he noted that "[e]xacerbating factors include weightbearing and standing [while r]elieving factors include changing positions and percocet." He deemed her symptoms "tolerable at this time" but made no reference to the amount of medication that made her pain tolerable. (Tr. 343).

In September 2012, in connection with the claim for disability benefits, Dr. Jorge Ruelos, M.D., described Ms. Forbes' pain as "lower back radiating to the legs, shoulder, neck, arms and hands (both right and left side)." The pain manifested in an objective MRI finding of radiculopathy of the cervical and lumber spine. This type of impairment would be expected, he wrote, to produce significant pain, and was only "very mildly responsive to all kinds of medication for pain." (Tr. 414). He listed various pain medications, as well as the several therapies she had undergone, as treatment, but noted that "the medication makes her sleepy and unable to function." (Tr. 417).

One of the neurologists – Dr. Cielo or Dr. Cervone – had begun prescribing Percoset for Ms. Forbes. (Tr. 421). Dr. Ruelos continued to prescribe Vocidin. (Tr. 416). Because of Percoset's particular side effect of interfering with her ability to stay awake, she stopped taking it

just a few days before the hearing and had accepted Dr. Ruelos' referral to a pain clinic – a referral she had declined some years before. Dr. Ruelos also noted a number of appropriate treatments: physical, chiropractic, and yoga therapies. (Tr. 414).

## IV.

### Residual Functional Capacity

A dispute over Residual Functional Capacity (RFC) is the crux of this appeal. As explicated below, the ALJ denied benefits because he found that Ms. Forbes' RFC permitted her to perform her previous relevant employment as security guard. That conclusion was supported in part by the opinion of one of two state agency consultants. It was disputed, either directly or indirectly, by both Ms. Forbes' treating physicians and by her own testimony.

The first state agency consultant, Dr. Kenneth Nanian, filed a report on May 23, 2011 – less than six months after the accident and well over a year before the hearing. Among other determinations, he found "no evid. of cerv.radiculopathy," and he concluded Ms. Forbes had "Disorders of Back—Discogenic and Degenerative" that were "Non Severe." (Tr. 59). He concluded that her condition "does not result in significant limitations in [her] ability to perform basic work activities" and thus was not disabling. (Tr. 60). Because this opinion was inconsistent with all the other evidence, the ALJ rejected it, and it is not relevant to any further discussion. (Tr. 23).

The second state agency consultant, Dr. Donn Quinn, rendered a report six months later, on October 12, 2011. Having reviewed records spanning an additional half-year, Dr. Quinn fundamentally disagreed with Dr. Nanian. Dr. Quinn concluded that the "Disorders of Back—Discogenic and Degenerative" condition Ms. Forbes suffered from constituted a severe impairment, "reasonably expected to produce the individual's pain or other symptoms." He also

concluded that Ms. Forbes' "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone." (Tr. 68).

Dr. Quinn went on to offer an opinion on Ms. Forbes' RFC in light of her impairment. He agreed she had exertional limitations, but he opined that she could occasionally lift and/or carry up to 50 pounds for up to 1/3 of each day's work and/or frequently lift and/or carry up to 25 pounds for 1/3 to 2/3 of each day's work. Moreover, he believed she could stand, walk or sit for 6 hours in an 8-hour workday, given breaks. (Tr. 69). His report concluded Ms. Forbes could do the light strength work previously done as a waitress or counter server.[5] (Tr. 70). Based on that finding, he concluded she was not disabled. (Tr. 71).

Treating physician Dr. Ruelos gave an opinion on Ms. Forbes' RFC that was dramatically different. He concluded she would

- rarely be able to "lift and/or carry 1 gallon of milk,"[6] and *never* be able to lift and/or carry 2 gallons,
- need to occasionally elevate her legs during the workday,
- need constant unscheduled rest breaks,
- only rarely be able to sit in one place without getting up to walk around,
- "constantly" have symptoms "severe enough to interfere with attention and concentration,"
- "constantly" be "off task" due to pain, fatigue and/or the effects of medication, and
- suffer symptoms severe enough to cause her to miss work more than 4 times per month.

(Tr. 415).

The purpose of the RFC is to determine what employment, if any, a claimant can carry out. Vocational expert Kenneth Smith had reviewed Ms. Forbes' age, education, and past work. He classified her security jobs as semi-skilled and "light" or "sedentary" duty, depending on the particulars of the job. (Tr. 46). He had no information about the work that Ms. Forbes actually

---

[5] He noted Ms. Forbes' additional previous work as a bagger, security officer and babysitter but did not assert that she had the ability to perform any of that prior relevant work. (Tr. 70).

[6] 8.6 pounds according to http://www.ask.com/food/much-gallon-milk-weigh-e1e3095697a2af9. (last visited on April 7, 2015).

was required to perform as a security guard, except the level of skill required was very low, as she was able to do it with one day's training. *Id.* He did agree that *if* Ms. Forbes were limited in her concentration, and would require at least four days off each month, she would be precluded from *all* work. (Tr. 47). *If* she could not regularly lift more than a gallon of milk, she would be limited to sedentary or less than sedentary employment. (Tr. 47-48).

## IV.

### Standard of Review

A district court's role in reviewing the Commissioner's decision is limited. Although questions of law are reviewed *de novo*, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). The term "substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The determination of substantiality must be made upon an evaluation of the record as a whole. *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) ("'We must uphold the Secretary's findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" (quoting *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). In reviewing the record, the Court must avoid reinterpreting the evidence or otherwise substituting its own judgment for that of the Secretary. *See Colon v. Sec'y of Health and Human Servs.*, 877 F.2d 148, 153 (1st Cir. 1989). The resolution of conflicts in the evidence is for the Commissioner, not the courts. *Rodriguez*, 647 F.2d at 222 (citing *Richardson*, 402 U.S. at 399).

The Court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (*per curiam*), *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir. 2001) (citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)).

## V.

## ALJ Decision

Ms. Forbes challenges several aspects of the ALJ's decision: (a) his RFC finding for its claimed failure to evaluate all the evidence and opinions and, specifically, his failure to include the limitations identified by her treating physicians; (b) his crediting of part of the opinion given by Dr. Quinn, one of the state agency consultants, relative to the RFC; (c) his failure to proceed without a medical advisor in allegedly reaching conclusions beyond a lay person's capacity; (d) his failure to characterize any conditions other than the degenerative disc disease as severe, even in combination; and (e) what is contended to be an insufficient analysis resulting in his rejection of Ms. Forbes as a credible witness.

A. ALJ Evaluation

The ALJ review is well-established as a sequential five-step process. 20 CFR 404.1520(a)(4) and 404.920(a)(4), described in detail in *McDonald v. Sec'y of Health and Human Serv.,* 795 F.2d 1118, 1120 (1st Cir. 1986):

First, the ALJ must determine whether the claimant, Ms. Forbes, is currently engaged in "substantial gainful activity." If she is, she is not disabled. In this case, the uncontroverted

testimony as well as the ALJ's finding was that Ms. Forbes was not then engaged in "substantial gainful activity." (Tr. 16). This part of the ALJ decision is not challenged.

Second, the ALJ is to determine whether Ms. Forbes suffers a severe condition or impairment, defined as one that "significantly limits ... her physical or mental ability to perform basic work-related functions." Here, the ALJ agreed with the claimant's assertion that she suffered from severe degenerative disc disease that significantly limited her ability to perform basic work-related functions. (Tr. 16). This part of the ALJ decision is not challenged.[7]

Third, the ALJ is to examine the list of impairments in 20 CFR Part 404, Subpart P, Appendix A (20 CFR 416.920(d), 416.925 and 416.926). Impairments on this list are automatically considered "severe" and the person suffering such an impairment is considered "disabled." The ALJ concluded that

> The claimant's cervical and lumbar degenerative disc disease do not meet or equal Listing 1.04 for disorders of the spine; there is no medical evidence of the requisite nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication as contained in this Listing.

(Tr. 17-18). This part of the ALJ decision is not challenged.

The failure to "make this list" does not end the inquiry: instead, the ALJ is to then proceed to the fourth step, to determine the claimant's "residual functional capacity" (RFC), which is "her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." (Tr. 15-16). Essentially, since the claimant's non-listed

---

[7] Ms. Forbes contended that she suffered from a number of other impairments which, singly or in combination, limited her ability to perform basic work-related functions. The ALJ rejected that claim ("The following impairments are considered non-severe because they do not cause more than a minimal effect on the claimant's ability to perform basic, work-related tasks: headaches, GERD, hypertension, abdominal pain, allergies, sinusitis, asthmatic bronchitis, fatigue, right hip pain, right shoulder pain, knee pain, urinary frequency, history of hysterectomy, history of cholecystectomy, and emotional difficulties") (Tr. 16-17); that rejection forms a part of Ms. Forbes' Motion for Reversal but, in light of the Court's remand for other reasons, it need not be addressed.

disease fails to render her automatically "disabled", the fourth step inquires whether she

nonetheless is disabled because the particulars of her impairment are inconsistent with her ability

to do her past relevant work or "*any* other work considering her residual functional capacity, age,

education, and work experience." (Tr. 16) (emphasis supplied). A person is to be considered

disabled only if "his physical or mental impairment or impairments are of such severity that he is

not only unable to do his previous work but cannot, *considering his age, education, and work*

*experience,* engage in any other kind of substantial gainful work which exists in the national

economy...." *McDonald v. Sec'y of Health and Human Serv., supra* at 1119-20.    Thus, if Ms.

Forbes can perform her past relevant work, or any other work existing in the economic

marketplace, she is not disabled.

 Ms. Forbes and the ALJ part ways at this fourth step:  determination of the RFC.  The

ALJ determined that Ms. Forbes

> has the residual functional capacity to perform light work as defined in 20 CFR
> 416.967(b) in that the claimant would be able to stand/walk for up to six hours in
> an eight-hour workday.  The claimant would also be able to sit for six hours in an
> eight-hour workday.  The claimant would be able to lift/carry up to twenty pounds
> occasionally and ten pounds frequently.    Because of effects of pain and/or
> medication, the claimant would be able to maintain concentration and attention
> sufficient to perform only uncomplicated work tasks of up to several steps over an
> eight-hour workday, assuming short work breaks on average every two hours.

(Tr. 18).  As a result, he concluded at the <u>fifth</u> step that she could perform her past relevant work

and, ultimately, that she "has not been under a disability, as defined in the Society Security Act,

since November 30, 2010, the date the application was filed (20 CFR 416.920(f))."  (Tr. 24-25).

 He then decided Ms. Forbes is not disabled within the meaning of §1614(a)(3)(A) of the

Social Security Act.  (Tr. 25).

B.  Underline{Analysis of ALJ Decision}

Determining RFC

Ms. Forbes' relevant past work was as a security guard.[8]  The conclusion that she could

continue to perform that work had two components:  what the work entailed, and what Ms.

Forbes' RFC allowed her to do.

With respect to the former, the ALJ had two sources of information.  Impartial vocational

expert Kenneth Smith concluded that the security guard job would be "semi-skilled" (based on

Ms. Forbes' reporting that she had had only one day of training) and "light" duty.  Ms. Forbes

had testified to the actual physical requirements of the three stints she spent as a security guard.

Each job had aspects of sedentary work – either sitting in a booth signing drivers onto and off the

premises or monitoring what presumably were cameras – and aspects of non-sedentary work

when she had to physically patrol the property.  (Tr. 37-38).  In the job she described in more

detail, she was required to patrol on foot all areas in the building, which took about 15 minutes,

and after that was completed, she was required to walk the perimeter of the parking lot; each tour

had to occur once each hour.  (Tr. 38).  Mr. Smith never testified to the physical demands of a

security guard job or offered any evidence contradicting Ms. Forbes' description of the

substantial walking and standing that such employment requires.

With respect to Ms. Forbes' capacity for physical tasks, the ALJ had several sources of

information described above:

> 1.  Ms. Forbes herself, who said that she was not capable of standing more than 5 or 10
> minutes at a time; that she sometimes lost the capacity to grip objects; that she could lift
> only one gallon of milk (about 8.5 pounds) at a time; that her pain was controlled often

---

[8] The ALJ did not address the anomaly that Dr. Quinn, in his assessment, did *not* opine that she
could perform her past work as a security guard.  Instead, he opined that she could perform the
duties of a "waitress [or] counter [help] – jobs "[g]enerally [p]erformed in the [n]ational
[e]conomy."  (Tr. 70).

only by Percoset, which made her fatigued and required her to take long and frequent naps.

2. Treating physician Dr. Ruelos who opined she could rarely sit in one place without needing to get up and walk around; that she would only rarely be able to carry or lift one gallon of milk and never two; that she would constantly suffer such pain that she could not concentrate and would need constant unscheduled breaks. In addition, she would likely be out of work due to illness more than four days/month.

3. Consultant neurologist Dr. Cielo, who noted that weight-bearing and standing were exacerbating factors for Ms. Forbes' pain (and that changing positions and Percoset were pain-relieving measures).

4. Treating neurologist Dr. Cervone who termed her "totally disabled" but was not specific about her physical capabilities.

5. State agency consultant Dr. Quinn who opined that she could lift and/or carry 25 pounds regularly and 50 pounds frequently; and that she could stand or walk 6 hours out of each 8 hour day.

In finding that her RFC permitted her to perform the work of a security guard, the ALJ found that Ms. Forbes:

A. "would be able to stand/walk for up to six hours in an eight-hour workday;"

B. "would also be able to sit for six hours in an eight-hour workday;"

C. "would be able to lift/carry up to twenty pounds occasionally and ten pounds frequently;"

D. "would be able to maintain concentration and attention sufficient to perform only uncomplicated work tasks of up to several steps over an eight-hour workday, assuming short work breaks on average every two hours."

(Tr. 18).

The Court finds that the ALJ's determination was faulty in several respects, each of which requires a remand for reconsideration of the evidence and/or the taking of additional evidence.

First, the ALJ's determination that Ms. Forbes could "lift/carry up to twenty pounds occasionally and ten pounds frequently" is without support in the record. There were only three

sources of information regarding capacity to lift/carry: consultant Dr. Quinn's opinion that she could lift/carry up to 50 pounds occasionally and 25 pounds frequently – an opinion the ALJ rejected ("[T]he full record supports a conclusion that the claimant is more limited in her ability to lift/carry ...") (Tr. 23); treating physician Dr. Ruelos' opinion that she could lift a gallon of milk occasionally, but never more than one (Tr. 415) – an element the ALJ did not address when discussing Dr. Ruelos' opinion (Tr. 23-24); and Ms. Forbes' testimony that she could not lift a laundry basket. (Tr. 42-43). An ALJ's finding is conclusive if it is based on "substantial evidence." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999). In this case, the ALJ's opinion on lifting and carrying capacity seemed to be a compromise, arrived at without evidentiary foundation, and not reflecting any medical foundation.

Second, the ALJ's acceptance of Dr. Quinn's opinion that Ms. Forbes could walk or stand up to 6 hours per day – clearly an integral component of the security guard work she previously performed – is insufficiently explained with respect to why he accepted Dr. Quinn's opinion on standing/walking after summarily rejecting his opinion on lifting/carrying. Dr. Quinn's opinion that Ms. Forbes could lift/carry *two-and-a-half times* the weight that the ALJ thought she could lift/carry (three times the weight that Dr. Ruelos thought she could carry) was not only incompatible with all the other evidence, it was so "out of whack" that it throws doubt on Dr. Quinn's opinion regarding Ms. Forbes' standing/walking capacity. That doubt required that the ALJ explain why he would accept Dr. Quinn's standing/walking assessment, which was also contrary to all the testimony from treating physicians and Ms. Forbes that she could only stand for short periods of time, that standing exacerbated the pain, that she would have to frequently elevate her legs, etc. *See infra* at Part III. Yet the ALJ did not articulate any explanation for why he credited "half" of Dr. Quinn's opinion but not the other "half."

Moreover, the ALJ failed to sufficiently explain why he rejected the contrary opinions of two other physicians. Consulting neurologist Dr. Cielo explained that both weight-bearing and standing were exacerbating factors for Ms. Forbes' pain. More significantly, treating physician Dr. Ruelos opined Ms. Forbes was limited to a *less than* sedentary work status with a need to elevate her legs and constantly take unscheduled rest breaks. Dr. Ruelos had examined Ms. Forbes no less than *eleven times* during the two years between the accident and the hearing.

Medical opinions from treating sources are generally given "more weight" because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, ..." 20 C.F.R. § 404.1527(c)(2). Additionally, Social Security Ruling 96-2p(6)'s Policy Interpretation reminds adjudicators "that a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." 1996 WL 374188 at *4 (July 2, 1996). It explains that such "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." *Id.* And it notes that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.*

The ALJ failed to give weight to the opinion of the treating physician (a) because he is a family practitioner, not an orthopedist, (b) because his treatment notes generally lacked objective findings, (c) because his 'treatment notes do not support his opinion [that she would be constantly off task and would be absent at least four days per month from work]" and (d)

because "his opinion is inconsistent with the overall evidence of record." (Tr. 24). A treating physician's opinion need not be given controlling weight if it is inconsistent with the other evidence. *Soto-Cedeno v. Astrue*, 380 Fed.Appx. 1, 1 (1st Cir. 2010). But the lack of specificity in treatment notes is not a sufficient reason, as, indeed, even the *absence* of treatment notes is not a sufficient reason for rejecting the opinion of a treating physician. *Id.* at 2. Unless a claimant is put to physical endurance tests, there is no objective way to determine how long she can stand, or how far she can walk, without a break. Significantly, Dr. Quinn himself concluded that Ms. Forbes' "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone." (Tr. 68). The only doctors who had actually *examined* Ms. Forbes supported her self-described limitations in standing and walking. The records of Dr. Quinn demonstrate no objective rationale for his rejecting the opinions of the physicians whose records he reviewed.

<u>Conclusions Beyond Lay Knowledge</u>

Ms. Forbes argues that the ALJ should have obtained the services of a medical advisor but, instead, "made medical judgment's [sic] that are beyond his capacity and the legal limits on his discretion." The ALJ's rejection of the treating physician's opinion does appear also to have been based on his own assessment of Ms. Forbes' condition:

> The undersigned does not give controlling weight to the claimant's treating provider, Dr. Ruelos, because his opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques; in addition, it is inconsistent with other substantial evidence in the record (20 CFR 416.927). MRI reports revealed degenerative disc disease at C5-C6 with narrowing of the left neural foramen and a lipoma with no tethering of the cord; in addition, the claimant had normal EMG and nerve conduction studies of both the upper and lower extremities. (See Exhibits 8F, 11F, 12F). Despite positive straight leg raising at 30 degrees, positive Spurling sign on the left, and decreased range of motion in the cerval and lumbar spine, a spinal exam in September 2011 revealed only mild tenderness to palpation, extremities were full strength bilaterally, muscle

> tone was normal, sensory exam was intact to light touch and pinprick, and
> a normal gait. (See Exhibit 16F).

(Tr. 23). Ms. Forbes challenges these conclusions as well beyond the ability of the ALJ to draw without support from a medical witness. The Court agrees. An ALJ is not qualified to interpret raw medical data. *Nguyen v. Chater, supra* at 35. *See also, Manso-Pizarro v. Sec'y of Health and Human Serv., supra* at 18-19 (where large amounts of critical notes were illegible, and readable notes indicated abnormalities, ALJ was required to obtain medical opinion and not rely on own conclusions from the record). Neither of the two consulting agency physicians explained the relationship between the cited evidence and the conclusion of Ms. Forbes' ability to stand or walk. Dr. Nanian's opinion was rejected *in toto* because he found the impairment itself was non-severe. Dr. Quinn offered only an assessment relative to the RFC and did not offer an opinion as to whether Ms. Forbes' allegedly debilitating pain was consistent with the objective findings.[9]

## Rejection of Ms. Forbes' Credibility

In addition, Ms. Forbes takes issue with the ALJ's finding that she was not a credible witness. The Court finds that the ALJ's rejection of Ms. Forbes' testimony lacked adequate justification. Ms. Forbes testified she could be on her feet only 5-10 minutes at a time. Where a claimant's allegations are rejected, the ALJ "must articulate specific and adequate reasons for doing so." *Auger v. Astrue,* No. CA 09–622S, 2011 WL 846864, at *9 (D.R.I. Feb. 3, 2011). The ALJ cited the lack of "supportive objective findings" to corroborate the claimant's assertion that she sometimes drops dishes, or that she fears falling so is accompanied when she goes

---

[9] If the ALJ was skeptical of the fact that Ms. Forbes' documented disc disease would cause the extent of the symptoms she reported, and which the treating physician accepted in rendering his opinion that she could not perform the duties of a security guard, it was incumbent upon him to obtain additional medical evidence directed at that connection. SSR 96-7p; SSR 96-6p, 20 CFR 416.927(e).

shopping. (Tr. 22). It is evident that the ALJ believed Ms. Forbes was exaggerating the debilitating effect of her disease, but all the medical evidence indicated that Ms. Forbes' disease *could* cause her reported symptoms and no evidence was introduced from non-medical sources about activities Ms. Forbes engaged in that were inconsistent with what she described. The ALJ himself lacks the training to draw his own conclusions about the consistency of Ms. Forbes' complaints with her disease. Courts have cautioned against a too-quick dismissal of extreme pain reported by a claimant whose objective medical record may not demonstrate the extent of the suffering:

> [D]espite our inability to measure and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from working. Because pain is a subjective phenomenon, moreover, it is possible to suffer disabling pain even where the *degree* of pain, as opposed to the mere *existence* of pain, is unsupported by objective medical findings. Referring to such pain as "excess pain," our cases have established a clear rule regarding its assessment: Once a claimant submits objective medical evidence establishing an impairment that could reasonably be expected to cause *some* pain, "it is improper as a matter of law for an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings." *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir.1986) (per curiam). The rationale behind the rule is obvious: Excess pain is by definition pain at a level above that supported by medical findings; permitting the Secretary to disbelieve pain testimony merely because it is objectively unsupported would effectively permit him to disregard altogether the phenomenon of excess pain, *id.,* and would therefore allow the Secretary to deny benefits to claimants whose pain in fact prevents them from working.

*Fair v. Bowen,* 885 F.2d 597, 601-02 (9th Cir. 1989) (emphasis original).

Finally, the ALJ's reasoning discounting Ms. Forbes' testimony was circular: he refused to give it credence in determining her RFC, but explained his refusal to give her testimony credence because "her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessed herein." (Tr. 22). *Compare, Edwards v. Colvin,* 586 Fed.Appx. 434, 434 (9th

Cir. 2014) (unpublished) (rejection of claimant's credibility concerning persistence and intensity of pain reasonable in light of her report of only mild tenderness, her treatment only with non-narcotic pain relievers and physical therapy, and her admission that her symptoms had resolved).

The Seventh Circuit, noting an ALJ's reliance on the "boilerplate language" of a template, specifically criticized the reasoning used by the ALJ here. There, in *Bjornson v. Astrue,* 671 F.3d 640, 644-45 (7th Cir. 2012), the ALJ stated:

> After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The government in that case described the above sentences as a "template, ... a passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains." *Id.* at 645. One problem with the reasoning, the Seventh Circuit explained,

> is that the assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.[10]

Impact of Pain and Medication

Additionally Ms. Forbes challenges the ALJ's conclusion because he failed to give sufficient weight to the debilitating effect of the pain Ms. Forbes suffered or to the side effects of the medication. Ms. Forbes had consistently said, and her physicians' notes reflect, that only

---

[10] The Court advised that "[t]he Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'" *Id.* at 646.

pain medication – in particular Percoset – ameliorated the pain. Percoset made her so fatigued, however, that she slept for hours after taking the medication. Nothing in Dr. Quinn's written submission contests either the degree of pain, or the frequency of fatigue as a side effect. The ALJ cited the opinion of Dr. Cielo that in September 2011, when he examined her, she found the pain tolerable (Tr. 21), but that is not inconsistent with the fact that she was taking frequent Percosets in order to attain that tolerance. The Cielo evaluation does not address the amount of medication Ms. Forbes might have been taking to achieve that "tolerable" level or how much fatigue she might have been enduring as a result. In addition, the ALJ did not address the fact that a few days before the hearing, Ms. Forbes had discontinued the Percoset at Dr. Ruelos' urging – *not* because it was ineffective but because she had been taking so much of it. By failing to address this situation, the ALJ failed to consider that the pain that the Percoset mitigated would only get worse, even though Ms. Forbes had by that time accepted a referral to a pain clinic which she had yet to attend.

<u>Conclusion</u>

"[I]t is well to bear in mind that '[t]he Social Security Act is a remedial statute which must be 'liberally applied.'" *Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 531 (6th Cir. 1992) (quoting *Marcus v. Califano*, 615 F.2d 23, 29 (2nd Cir. 1979)). "[T]he Social Security Act should be construed liberally in order to further its remedial purposes." *Slessinger v. Sec'y of Health & Human Servs.*, 835 F.2d 937, 943 (1st Cir. 1987) (citing *Cunningham v. Harris*, 658 F.2d 239, 243 (4th Cir. 1981). The *Cunningham* court explained that

> [W]e are also bound to interpret the Social Security Act as a program of social insurance on which people can rely to provide for themselves and their dependents. Claimants are the beneficiaries of insured wage earners, not recipients of government gratuities, and are entitled to a broad construction of the Act. In practical terms, when a Social Security Act provision can be

reasonably interpreted in favor of one seeking benefits, it should be
so construed.

658 F.2d at 243 (citations omitted). *See also Smirga v. Sec'y of Health & Human Servs.*, 607 F.

Supp. 680, 685 (W.D. Pa. 1985) ("Where evidence has been presented and the case is close as it

involves the application of the Social Security Act, the balance should be cast in favor of, rather

than against, coverage in order to fulfill the statute's broad and beneficient [sic] objects.").

In a case where a claimant's inability to work is episodically precluded because she has

"good days" and "bad days," because sometimes medication is effective in forestalling

incapacitating pain and sometimes it is not, because she can frequently perform household tasks

but frequently cannot, it is important to keep the realities of a work environment in mind.

> The critical differences between activities of daily living and activities in a full-
> time job are that a person has more flexibility in scheduling the former than the
> latter, can get help from other persons …, and is not held to a minimum standard
> of performance, as she would be by an employer. The failure to recognize these
> differences is a recurrent, and deplorable, feature of opinions by administrative
> law judges in social security disability cases.

*Bjornson v. Astrue, supra* at 647 (claimant testified that despite painful and frequent migraines,

she had one or two good days each week, could stand for up to 15 minutes or walk up to one

block, and could bathe and dress normally).

For a number of reasons, the ALJ's conclusion that Ms. Forbes remains able to perform

the duties of a security guard, and is therefore not disabled, cannot be accepted on this record and

this opinion. The matter is therefore remanded for reconsideration.

SO ORDERED,

John J. McConnell, Jr.
United States District Judge

Date: April 8, 2015